IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WILLIAM RAY MORRIS, IV, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 15-CV-429-PJC |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff, William Ray Morris, IV, seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner" and "SSA") denying Morris' application for disability insurance benefits and for supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* For the reasons discussed below, the Commissioner's decision is **AFFIRMED**.

### Procedural History

Morris filed an application for disability insurance benefits with a protective filing date of October 13, 2011. (R. 11, 140-43.)[1] He later filed an application for supplemental security income on October 27, 2011. (R. 144-49.) He alleged onset of disability as of May 1, 2011 in both applications. Morris claimed he was disabled due to "back, legs, add, depression." (R. 157.) The applications were denied initially and on reconsideration. (R. 74-79.)

An administrative hearing was held before Administrative Law Judge ("ALJ") Bernard Porter on September 9, 2013. (R. 28-69). By decision dated February 10, 2014, the ALJ ruled

---

[1] The ALJ sets forth this protective filing date in his decision, but it is not clear from the record when this date actually occurred. It is not marked on the intake sheet. (*See* R. 153.) Nonetheless, the timing of the application is not at issue in this appeal.

that Morris was not disabled under section 216(i) and 223(d) of the Social Security Act from May 1, 2011 through the date of the decision. (R. 11-20.) Morris requested review of the decision, and, on May 30, 2015, the Appeals Council denied review. (R. 1-5.) Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481; *see, e.g., Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). Morris timely sought review by this Court.

## Background

Morris was born April 26, 1977. (R. 33, 140.) He was 34 years old on his alleged disability onset date, May 1, 2011, and he was 36 years old at the time of the ALJ's decision on February 10, 2014. (R. 19, 33.) The highest level of education that he completed was the eleventh grade. (R. 37, 157.) He did concrete work, construction work, work in the poultry industry, and work on a drilling rig. (R. 27-43, 158.) He also stocked groceries. (R. 158.) In addition, he reported that he was a packer at a glass plant and a ditch hand for an excavating company. (R. 198).

In an Adult Function Report completed April 5, 2012 (Ex. 4E), Morris reported that he was unable to bend over or pick up anything due to pain. (R. 173). He listed his daily activities as sitting in a chair, eating breakfast, and watching TV. (R. 174.) He indicated that he used to be able to play with kids, work, and fish, but could no longer do so. He usually awakened from pain several times during the night. He claimed that he was unable to put on his shoes and socks, and his wife washed his feet. (*Id.*) His wife prepared meals because he could not stand for very long. (R. 175.) He did not do house or yard work because of the pain in his back and left leg prevented him from doing so. (R. 176.) He stated that he was able to go outside four times daily for walks, and he was able to ride in a car. (*Id.*) However, he was unable to drive

2

because of medication and pain in his leg, and he was afraid that he would not be able to use the pedals properly. (*Id.*)

Morris asserted that his hobbies and interests are fishing and finishing cement, and he used to do them a lot, but he could no longer do either of them. (R. 177.) He was able to talk with others on the phone daily but did not go places on a regular basis. He needed someone to drive him. (*Id.*) He could not go out and did not see friends anymore. He was no longer able to go to his children's ball games. (R. 178.) His injuries and conditions affected his lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing. He could walk about 50 feet before he needed to stop and rest, and he was able to resume walking after about three to four minutes. (*Id.*) He used a cane as prescribed by a doctor in January of 2012. (R. 179.) He could finish what he started, follow written and spoken instructions well, and get along with authority figures well. He was able to handle stress and changes in routine "okay." (R. 178-79.) His medications included Lortab, Tizanidine, Diclofenac, and Simvastatin. (R. 180.) In a subsequent disability report submitted June 1, 2012, Morris also listed Gemfibrozil and Meloxicam along with the Lortab and Simvastatin. (R. 186.) On June 28, 2013, Morris wrote that he was taking Buspirone, "Narco 10," Albuterol "HFA," and Fenofibrate in addition to the Meloxicam and Simvastatin. (R. 241).

At the administrative hearing, Morris testified that he does not have a driver's license because he failed to pay child support and his license was taken from him. (R. 6). He gets around without a license because his wife drives. (R. 37.) The transcript of the hearing shows that the ALJ allowed Morris to stand when he was uncomfortable sitting. (R. 41.) Morris claimed that his back prevented him from working at that time. (R. 43.) He had surgery in 2011 or 2012, and was better after that. (R. 44.) He also had physical therapy, and that helped. (*Id.*)

His surgeon told him that he would fuse his spine again, but that he should try to avoid surgery if he could. (R. 45.)

Morris testified that he could walk about 50 feet without stopping, but he had to stop in between. (*Id*.) He could stand for about 15 or 20 minutes before he need to sit, and he could sit five to 10 minutes before he needed to move. (R. 46.) He did not know how much he could lift and carry because he was afraid to try, but he could carry a plate of food. (R. 46-47.) Morris rated his pain, on a scale of one to 10, as a seven on an average day. (R. 47.) He testified that his medications included Hydrocodone, Tramadol, Buspirone, and Lorazepam. (R. 47.) Weather, car rides, and his "old hard bed" aggravated his pain. (R. 48.) Sitting aggravated his pain, but a heating pad made it better. (R. 48.)

Morris described his daily activities as including, among other things, taking the two minor children who live with him to school, and playing checkers or doing other sedentary activities, like watching TV, after they came home from school. He also stated that "we give them baths." (R. 49.) He helped out around the house if he felt good enough, and used a bar stool to help his wife do the dishes. (*Id*.) He did not do laundry, and could not mow his yard because of his back. (*Id*.) He tried to do a little cooking, and used his stool when he did. (R. 50). He also helped with grocery shopping, but would have to sit at the store. (R. 50). His hobbies were "pouring cement" and fishing, but he had not fished in three years. (*Id*.) He had two dogs. (R. 50-51.) Morris tried some exercises, but he became depressed and had no motivation. (R. 51-52.) He was able to watch his son play baseball when it was not too hot. (R. 52.) He was able to go to tournaments. His sons played competitive baseball, and he could attend games at least once per week. (R. 53.) His daily activities also included sitting on the front porch. (R. 56.)

4

At the time of the hearing, Morris had been seeing Dr. Stephen W. Woodson for about three months, even though, Morris stated, "he doesn't take . . . back patients." (R. 58.) Dr. Woodson saw him primarily to treat his pain, but also for his anxiety and depression." (R. 59.) Dr. Woodson gave him some medication which did not make him feel better, but made him sleep. (R. 60.) He also told Morris that the anxiety and depression came with chronic pain. (*Id*.)

The vocational expert summarized Morris' previous work experience as a concrete finisher, construction worker, egg producing farm laborer, and an oil field worker. (R. 61-62.) However, he had worked in the oil field for only three months. (R. 62.) The ALJ asked the vocational expert to assume that a hypothetical person with these past jobs was limited to less than a full range of light work with the ability to lift and carry 20 pounds occasionally and 10 pounds frequently. Such person could sit for six hours, stand for six hours, walk for six hours, and push and pull as much as he could lift and carry. (R. 62.) Further, such person could occasionally use foot controls, and climb ramps and stairs, but never climb ladders or scaffolds. (R. 62-63). He or she should never crawl and should not work around unprotected heights or move any mechanical parts. (R. 63.) Such person should never work in environments where there are temperature extremes. Such person would be limited to simple tasks and simple, work-related decisions. He or she could frequently work directly with supervisors, coworkers, and the public. Time off tasks would be accommodated by normal breaks.

The vocational expert testified that such a hypothetical individual could not perform any of the past relevant work previously described, but such person could perform as a cashier, and arcade attendant, an electrical assembler. (R. 63.) If the person had to change positions at least every 30 minutes, such person could still perform work as an arcade attendant, electrical assembler, and a small product assembler. (R. 63-64.) If the person was limited to sedentary

5

work, the person could perform the job of optical goods assembler, order clerk "wooden beverage," and touch-up screener. (R. 64.) If the hypothetical individual had chronic pain which required four extended work day breaks of 15-20 minutes in duration, there would be no competitive work the individual could perform. (R. 65.)

Morris then testified that, if offered a job which did not involve a lot of lifting, and where he could sit or stand at will, he would try, but he did not know if he could be there every day. He had not "tested" himself. (R. 66.) He had moved into a handicapped accessible home. (*Id.*) He hoped to be able to get better and ride a bike with his kids, take them fishing, and play catch with them. (R. 67.) At the time of the hearing, he planned to have surgery if he could get the money to do so. (R. 68.)

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520; 416.920; *see, e.g., Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (detailing steps).[2] "If a determination can be made at any of the steps that a

---

[2] Essentially, the steps involve answering the following questions: (1) Is the claimant presently working? (2) Does the claimant have a severe impairment, i.e., one that "significantly limits" his or her ability to do basic work activities? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent the claimant from performing his or her past relevant work? (5) Does the impairment prevent the claimant from performing other jobs

claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax v. Astrue,* 489 F.3d 1080, 1084 (10th Cir. 2007) (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope to two inquiries: first, whether the decision was supported by substantial evidence in the record; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than preponderance." *Wall*, 561 F.3d at 1052 (quotation and citation omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.* (quotation and citation omitted).

### Decision of the Administrative Law Judge

In his decision, the ALJ found that Morris met insured status requirements through December 31, 2012, and, at Step One, that Morris had not engaged in any substantial gainful activity since his alleged onset date of May 1, 2011. (R. 13.) The ALJ found at Step Two that Morris had the severe impairments of lumbar disc disease with radiculopathy, depressive disorder, history of alcohol abuse, and generalized anxiety. (*Id.*) At Step Three, the ALJ found that Morris did not have an impairment or combination of impairments that met or medically equaled the severity of any listing. (*Id.*)

In accordance with the hypothetical questions posed to the vocational expert at the administrative hearing, the ALJ's finding with regard to Morris' RFC were as follows: Morris had the RFC to perform sedentary work except that Morris could use foot controls. He could

---

that exist in significant numbers in the national economy? *See Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 804; 119 S.Ct. 1597, 1602, 143 L.Ed.2d 966 (1999).

occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds.  Further, he should never be around unprotected heights or moving mechanical parts.  He should never crawl and should not work around environments with temperature extremes.  He was limited to simple tasks and simple work-related decisions.  Morris could have frequent interaction with supervisors, coworkers, and the public.  His time off task would be accommodated by normal breaks.  He required a sit/stand option allowing a change of position at least every thirty minutes. (R. 15.)

At Step Four, the ALJ determined that Morris was unable to perform any past relevant work. (R. 20.)  The ALJ then determined that transferability of job skills was not material to the determination of disability, and, at Step Five, that there were jobs existing in significant numbers in the national economy that Morris could perform. (*Id*.)  The ALJ concluded that Morris was not under a disability, as defined in the Social Security Act, at any time from May 1, 2011 through the date of the decision, February 10, 2014. (R. 21.)

## Review and Analysis

On appeal, Morris argues that the ALJ's credibility determination was legally flawed and not supported by substantial evidence.  The Tenth Circuit Court of Appeals has observed: "[C]redibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010) (internal quotation marks omitted).  Those findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id*. (internal quotation marks omitted).  Yet, as long as the ALJ "sets forth the specific evidence he relies on in evaluating the claimant's credibility," there is no need for a "formalistic factor-by-factor recitation of the evidence." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012)

(internal quotation and citation omitted). "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. *Id.* The Court finds that the ALJ's determination in this case was supported by substantial evidence.

Morris' argument on appeal is directed at the ALJ's credibility analysis regarding his physical impairment, although the ALJ also discussed Morris' alleged mental impairments. (*See* R. 14-15.) With regard to Morris' physical impairment, *i.e.*, his lumbar disc disease with radiculopathy, the ALJ summarized Morris' allegations regarding the intensity, persistence, and limiting effects of his symptoms. (R. 16.) He specifically noted Morris' medications, Morris' testimony regarding his limited physical abilities, and Morris' reports regarding his activities of daily living.[3] (*Id.*) Yet, he found that Morris' statements about the intensity, persistence, and limiting effects of his symptoms were not entirely credible, for the reasons set forth below.

The ALJ turned first to the medical evidence in the record. He noted the records from the Haskell County Community Hospital in early 2011 which indicated that Morris was unable to stand straight, and an x-ray taken at that time showed mild degenerative disease.[4] (R. 17, 243-51.) He also described the findings of Ronald Schatzman, M.D., the consultative examiner who evaluated Morris on February 21, 2012. Dr. Schatzman specifically noted that Morris had a limited range of motions associated with muscle spasm, pain and tenderness. (R. 279.) He also

---

[3] Morris argues that the ALJ did not adequately discuss his daily activities or specifically mention certain ones, such as the games he played with his children, helping to bathe his children, helping his wife wash dishes and cook, and attending his son's baseball games. However, as the Commissioner points out, Morris' ability to do these things, albeit in limited fashion, demonstrates that he is not disabled. His ability to provide some care for his children, in particular, provides support for the ALJ's determination that Morris could continue to do sedentary work with appropriate limitations. *Cf. Wilson*, 602 F.3d at 1146.

[4] Additional x-rays were taken on February 6, 2012 and February 13, 2012 which showed "normal lumbar spine series for age" (R. 256), and "[f]ive lumbar segments are present with disc space narrowing at L5-S1 and minimal early spondylitic degenerative changes. . . . [v]ertebral bodies, disc spaces and spinal canal are otherwise normal" (R. 266.)

9

pointed out that Morris' straight leg raising test was positive bilaterally sitting and supine. (*Id.*) His diagnostic impression was that Morris had low back pain and radiation of pain down the left leg. (*Id.*)

Significantly, the ALJ noted the Magnetic Resonance Imaging (MRI) taken on February 21, 2012, which led to neurosurgery on Morris' lumbar spine. (*See* R. 17.) The surgeon who performed the surgery, Scott T. Dull, M.D., indicated that the lumbar MRI showed "large left L4/5 HNP [herniated nucleus pulposus] with neural compression; L3/4 and L5/1 DDD [degenerative disc disease] with bulging." (R. 292; *see* R. 270.) Morris had the lumbar discectomy on February 29, 2012 (R. 292-95.) Upon Morris' discharge, Dr. Dull reported that Morris had a successful result, was able to walk straight, his leg pain was gone, and was ambulating well. (R. 288.) Morris subsequently attended physical therapy sessions between March 27, 2012 and May 4, 2012, although he cancelled or did not show for the last three. (R. 353-74.) The ALJ noted that this suggested his symptoms had improved. (R. 17.)

The medical record shows that Morris began presenting at the Wasi Medical Clinic in March of 2012, complaining of lower back pain, and began asking for pain medications in May of 2012, after he stopped attending physical therapy. (R. 321-36.) On June 5, 2012, he presented at the Haskell County Community Hospital complaining of back pain and stating that he was "out of pain pills." (R. 351.) On June 28, 2012, he again went to the hospital. The notes show that his primary care physician had prescribed five Lortab per day, but he was out and wanted more. (R. 348.) On July 2, 2012, he went to the Wasi Medical Clinic again, wanting his pain medications refilled. (R. 325.) The ALJ noted the Wasi Medical Clinic treatment notes from later in July, 2012, showing that Morris continued to have tenderness and pain with range of motion in the lumbar spine, and he used a cane. (R. 17; R. 322.)

10

As discussed by the ALJ, Morris had another MRI in August 3, 2012, which revealed "degenerative and postsurgical changes with varying degrees of central canal stenosis and foraminal narrowing involving the L3-S1 levels. . . ." (R. 339; *see* R. 17.) The degrees ranged from mild to moderately severe. (R. 338-39.) On August 8, 2012, Morris presented at the Haskell County Community Hospital complaining of lower back pain after he tripped over a tricycle. (R. 340.) He rated his pain at a 7-8 out of 10. (*Id.*) An x-ray of his lumbar spine taken that same day showed "no change" from a prior study dated March 21, 2011. The radiologist reported: "Degenerative disk disease at L4-L5 and L5-S1. Vertebral body heights are maintained. Vertebral alignment is maintained. No fracture." (R. 344.)

A few days later, on August 14, 2012, Dr. Dull saw Morris for a follow up appointment after Morris' discectomy. He reviewed the MRI and reported: "[T]here are postoperative changes at the L4/5 level. There is no recurrent disk herniation. He has degenerative disk disease at L3/4, L4/5, and L5/S1, not significantly changed from his previous study. There is no significant canal compromise at any level." (R. 376.) Dr. Dull also acknowledged that Morris had done well after surgery but then developed pain in his lower back, although he had no radicular or leg symptoms. (R. 375.) Dr. Dull thought that Morris' lower back pain was from some myofascial inflammation, but he did not think that Morris had "new lumbar disk disease of concern." He recommended an injection to try to resolve the pain issue. (R. 377.)

In November of 2012, Morris visited Stephen W. Woodson, D.O., as the ALJ noted. (R. 17, 445.) Morris had a disheveled appearance and was anxious and diaphoretic. He told the doctor that he had been seeing Dr. Wasi for pain management but had stopped seeing him the previous week. He also told the doctor that he had been taking Lortab, Meloxicam, and Tizanidine (five to eight per day), but had not had any for three days. (R. 445.) He specifically

11

asked for pain medications. A pain management list was given to Morris to make an appointment, and he was instructed that "this office does not provide pain mgmt. services." (R. 446.) On April 23, 2013, Morris returned to Dr. Woodson and presented with anxiety and panic attacks. The report indicates that Morris was a recovering alcoholic and drug addict. (R. 447.) As the ALJ stated, Morris reported that he had stopped taking his pain medications, and he reported constant pain. (R. 18, 447.) Upon examination, however, the doctor reported as to Morris' musculoskeletal system: "No pathology noted. ROM [Range of Motion] normal." (R. 449.) Morris returned to Dr. Woodson on July 17, 2013, complaining of low back pain. (R. 450.) The ALJ again noted that Morris was anxious and tearful, but he had a normal range of motion and sensation. (R. 18, 452.) Dr. Woodson started Morris on Cymbalta. (*Id.*)

The ALJ found that these findings did not support Morris' allegations of disabling symptoms. He reasoned that, although Morris "did have a significant back issue, his surgery resolved many of the radicular symptoms. In fact, other than an acute exacerbation in the summer of 2012, his condition had improved. He also had a normal range of motion." (R. 18.) The Court finds that, far from relying on a selective view of the objective medical evidence, the ALJ provided a comprehensive review of the evidence and linked his credibility determination to it. He did not disregard Morris' continued problems with his lower back; instead, he noted that they supported a reduction to sedentary work with postural and environmental limitations and a sit/stand option to prevent an exacerbation of his symptoms. The ALJ added that Morris would be prevented from working around hazards to prevent further injury. (*Id.*)

Support in the medical record is among the various factors properly considered in making a credibility determination. *See* 20 C.F.R. §§404.1529, 416.929. Furthermore, it is not the diagnosis of a condition, but the functional consequences of the condition that form the basis of a

12

disability determination.  *See, e.g., Madrid v. Astrue*, 243 Fed. Appx. 387, 392 (10th Cir. 2007) (diagnosis of a condition does not establish disability; the question is whether an impairment significantly limits the ability to work); *Scull v. Apfel*, 2000 WL 1028250 at *1 (10th Cir. 2000) (unpublished) ("disability determinations turn on the functional consequences, not the causes of a claimant's condition"); *Coleman v. Chater*, 58 F.3d 577, 579 (10th Cir. 1995) (the mere presence of alcoholism is not necessarily disabling; the impairment must render the claimant unable to engage in any substantial gainful employment); *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988) (diagnosis of depression did not render the claimant unable to perform his past relevant work).

## Conclusion

The Commissioner's decision denying Plaintiff's application for Social Security benefits shows that the correct legal principles have been followed and is supported by substantial evidence.  Accordingly, the Court **AFFIRMS** the Commissioner's decision.

**ENTERED** this 26th day of October, 2016.

_____
Paul J. Cleary
United States Magistrate Judge